I write to address certain evidence upon which the Englands rely as proof of an agency relationship between Deere and Warrior that is not expressly referenced in the main opinion.
The Englands contend that Warrior was acting with actual authority from Deere because Deere retained a right of control in connection with Deere's policy concerning repairs to malfunctioning skidders such as the one owned by the Englands. This policy, described as "fix as fail," called for an update kit to be installed on a skidder that malfunctioned, with Deere paying the cost of the replacement part plus shipping and the cost of labor divided equally between Warrior and the customer. This kit was available for only those customers who experienced failure of the hydraulic system. In this setting, Deere contended that it had "preauthorized" the repair. On the other hand, mandatory repair kits required the dealer to contact the customer who had purchased the faulty machine and to make the repair at Deere's expense. However, when Warrior's service manager was asked about what would happen if he placed an update kit on a skidder without getting approval from Deere, he responded by stating that Deere would not have to pay the claim under that circumstance and then added, "No, I have never did anything without [Deere] okaying it first, unless it was, you know, mandatory with the serial numbers wrote out to do it anyway." *Page 183 
When viewed most favorably to the Englands, the evidence shows the following: that the Englands repeatedly complained to Warrior over a period of years about the skidder's overheating, but an update kit was not installed on the skidder; that overheating constituted failure within the meaning of Deere's fix-as-fail policy; that Warrior finally told the Englands about the availability of update kit; that when the kit was installed the problem with the skidder was solved; and that the Englands continued to use the skidder in their logging operations.
There is no question that Deere controlled the circumstances under which it would be responsible for a portion of the cost of repairs to its products. Without doubt, the policy had practical consequences on Warrior's conduct. Obviously, Warrior, as the seller of a used piece of Deere equipment to the Englands, had to be aware of the financial consequences to it of disclosing Deere's fix-as-fail policy before failure because, under such circumstance, the cost of any repair would not be defrayed in part by a contribution from Deere. Also, a determination that the circumstances justified implementation of the fix-as-fail policy had economic consequences on Warrior, because it would then be responsible for absorbing one-half of the labor costs for making the repair.
Merely creating the circumstance under which Warrior might act to prefer its own self-interest over that of its customer, standing alone, does not, however, constitute either the reservation of a right to control or the exercise of the right to control. Therefore, if Deere's contention in its reply brief that "no evidence was presented that Deere provided any instruction to Warrior Tractor concerning the installation of the update kit on the Englands' skidder or that Deere had the authority to prevent Warrior Tractor from informing the Englands of the update kit or from installing this kit" is accurate, then agency has not been established. But, as previously noted, Warrior's service manager testified that he did not make repairs without approval fromDeere except when installing a mandatory repair kit. It is undisputed that the repairs at issue in this case did not involve a mandatory repair kit. Of course, there was conflicting evidence on this issue, because Deere maintained that under the fix-as-fail policy, repairs were "preauthorized."
In light of the service manager's testimony, however, the jury could have reasonably concluded that the Englands were being truthful when they said that they had complained to Warrior about problems sufficient to warrant applicability of the fix-as-fail repair kit and, because the service manager never made such repairs without prior approval from Deere, Warrior's failure to make the kit available over a period of years resulted from the service manager's unsuccessful efforts to obtain approval from Deere. I consider this evidence a sufficient basis upon which the jury could conclude that Deere exercised control over Warrior on those occasions over the years when the Englands' complaints about problems with their skidder did not result in Warrior's making known to the Englands the availability of the fix-as-fail repair kit.
HARWOOD, J., concurs.